IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| KATHY BAKER; AND | § | |
| BRIAN CARAMANIAN, INDIVIDUALLY | § | |
| AS REPRESENTATIVE OF THE ESTATE | § | |
| OF ANA CARAMANIAN, DECEASED; | § | |
| | § | |
| VS. | § | C.A. NO. 1:17-CV-00372 |
| | § | |
| TOYOTA MOTOR CORPORATION, | § | |
| TOYOTA MOTOR SALES, U.S.A., INC., | § | |
| & TOYOTA MOTOR ENGINEERING & | § | |
| MANUFACTURING  NORTH AMERICA, INC. | § | JURY DEMANDED |

---

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW,** Brian Caramanian, Individually and as Representative of the Estate of Ana Caramanian, Deceased (hereinafter collectively referred to as "Plaintiff" or individually by their last names), complaining of Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc.  This claim is related to MDL No. 2599, *In Re: Takata Airbag Product Liability Litigation* and should be transferred to the Southern District of Florida, Miami Division, as all claims involve an inflator defect/airbag defect and the claim involves an aggressive deployment.

**Introduction**

1.      The Plaintiff herein suffered severe and permanent injuries resulting in death caused by the failure of the Takata airbags installed in their Toyota vehicle, which aggressively exploded on impact.  Plaintiff  suffered severe and permanent injuries, resulting in death, as a result of the defective airbag system in their vehicle, as well as other defects therein.

**Nature of the Claims**

2.     People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

3.     An airbag supplier must take all necessary steps to ensure that its products – which literally can make the difference between life and death in an accident – function as designed, specified, promised and intended.  Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

4.     This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata") and equipped in vehicles manufactured by Defendants Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively, the "Vehicle Manufacturer Defendants").

5.     All Takata airbags at issue in this litigation share a common, uniform defect:  the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator, ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.  The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

6.      The following basic illustration depicts Takata's airbag module:



7.      In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.  Indeed, ammonium nitrate is the explosive that Timothy McVeigh and Terry Nichols used I n April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City.

8.      Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

9.      As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants. As of July 2017, Takata airbags have been responsible for at least 12 deaths and 180 serious injuries in the United States alone.

10.     When the Vehicle Manufacturer Defendants purchased Takata's airbags for their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

11.     The volatility and instability of Takata's ammonium-nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

12.     Takata and the Vehicle Manufacturer Defendants first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland.  BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the incident as an anomaly, without alerting federal safety regulators.

13.     Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata investigated the incident and inaccurately minimized it as "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

14.     The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions.  It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

15.     Behind the scenes, however, Takata and Honda were busy conducting tests that revealed far more serious problems. As reported in *The New York Times*, Takata conducted  secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results

to conceal the defect. After a 2007 airbag rupture, Honda began collecting inflators for further testing as well.

16.     Tragically, these airbag failures were the first of many to come.  Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls. Despite the repeated Takata/Honda recalls, and though the other Vehicle Manufacturer Defendants knew their vehicles were also equipped with Takata airbags containing ammonium nitrate, they failed to take reasonable measures to investigate or protect the public.

17.     Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators, the press, and private plaintiffs. By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action.  Whereas approximately 3 million vehicles had been recalled up until  that point (the vast majority of which were Hondas), the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers. Just one year later, in June 2014, another 5.6 million vehicles were recalled, and by October 2014, global recalls had reached 16.5 million vehicles.  As of July 2017, global recalls exceed 60 million vehicles.

18.     Even then, Defendants worked hard to limit the scope of the recall to humid parts of the country. They strenuously and falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South. And they mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

19.     By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California. Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-

humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures*.

20.     With additional pressure and public scrutiny, the Vehicle Manufacturer Defendants eventually agreed to NHTSA's demand. At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

21.     In response to the additional pressure and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to rupture.

22.     In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate. Still, even Takata's defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate. And shockingly, certain Vehicle Manufacturer Defendants continue to equip new vehicles with inflators containing ammonium nitrate, even after conceding that inflators containing ammonium nitrate create an unacceptable public safety hazard.

23.     Further, in its DIRs, Takata acknowledged that the defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

24.     As a result of Takata's admission that its inflators are defective, tens of millions additional vehicles have been or will be recalled in the United States, pushing the total number of recalled vehicles nationwide over 44 million.  While Takata has records of which manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in. The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

25.     As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively. Defendants have acknowledged that the process could take several *years* because of supply constraints. Even before the number of recalled vehicles nationwide doubled from approximately 17 million to 34 million, Honda's spokesman acknowledged that "[t]here's simply not enough parts to repair every recalled single car immediately."

26.     Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced. Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced. And following Takata's submission of the May 18th DIRs, NHTSA's recall website received over one million visits.

27.     Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars. Some of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiff. As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

28.     Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as

the propellant within the inflator, a fact that Takata's representative admitted at a Congressional hearing in June 2015. At the Congressional hearing, the Takata representative repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect- free.

29.     Takata and the Vehicle Manufacturer Defendants knew or should have known  that the Takata airbags installed in millions of vehicles were defective. Both Takata and the Vehicle Manufacturer Defendants, who concealed their knowledge of the nature and extent of  the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety. Moreover, the Vehicle Manufacturer Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

30.     The actions of Takata and Honda have been especially disturbing. Despite the shocking record of injuries and failures in Honda vehicles, Takata and Honda were slow to report the full extent of the danger to drivers and passengers, and they failed to issue appropriate recalls. Honda and Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem. Although Takata and Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 15 years.

31.     Even before purchasing inflators from Takata, the Vehicle Manufacturer Defendants were aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus the Vehicle Manufacturer Defendants were on notice of the Inflator Defect even before they installed the inflators in their vehicles, because Takata reviewed the designs of the inflators with the Vehicle Manufacturers and the Vehicle Manufacturers

approved the designs. The Vehicle Manufacturer Defendants were also put on notice of the Inflator Defect no later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Because their vehicles also contained Takata airbags, the Vehicle Manufacturer Defendants knew or should have known at that time that there was a safety problem with their airbags, and the Vehicle Manufacturer Defendants should have launched their own investigations and notified their customers.  That responsibility only grew as incidents multiplied.

32.    Instead, Defendants put profits ahead of safety. Takata cut corners to build cheaper airbags, and the Vehicle Manufacturer Defendants sold Plaintiff a vehicles that they knew or should have known contained those defective airbags. For several years  Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only relatively recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

33.    As a result of Defendants' misconduct, Plaintiff was harmed and suffered actual damages.

34.    Further, Plaintiff did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Vehicles paid more, either through a higher purchase price or higher lease payments, than they would  have had the Inflator Defect been disclosed. Plaintiff was deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

35.     Plaintiff also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

36.     Also, as a direct result of Defendants' misconduct, each plaintiff has out-of-pocket economic damage by virtue of their having incurred the expense of taking the time to bring their car in for repair.

37.     Also, as a direct result of Defendants' misconduct, each plaintiff suffered serious injuries or death as a result of the defective Takata airbags.

38.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.  The Vehicle Manufacturer Defendants herein are responsible for their component parts placed in the vehicle they placed in the stream of commerce with defective Takata inflators.

## JURISDICTION AND VENUE

39.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over the Defendants because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District.  In addition, one or more of the accidents occurred in this District; and some of Plaintiff's claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

40.     This Court also has personal jurisdiction over the Vehicle Manufacturer Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Plaintiff residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1407.

## THE PARTIES

### Plaintiff

42.     Unless otherwise indicated, Plaintiff purchased her vehicles primarily for personal, family, and household use. Plaintiff was seriously injured and died, and suffered actual damages. The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff.

43.     Plaintiff Brian Caramanian, Individually and as Representative of the Estate of Ana Caramanian, Deceased, is a resident of Humble, Texas.

### Vehicle Manufacturer Defendants

44.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States. Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

45.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation. Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota Motor Corporation.

46.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan. TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada. TEMA is a subsidiary of Toyota Motor Corporation.

47.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants." Toyota vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants. The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

48.     All of the Defendants are collectively referred to as the "Vehicle Manufacturer Defendants."

## GENERAL FACTUAL ALLEGATIONS

### Takata is a Major Manufacturer of Airbags and Inflators.

49.     Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s.

50.     Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983. By 2014, Takata had captured 22 percent of the global automotive airbag market.

51.     Takata Corporation has claimed to prioritize driver safety as its "dream," "dedication," and "commitment."

52.     Takata claims to be "motivated by the preciousness of life" and pledges to "communicate openly and effectively."  Takata has failed to live up to these assurances by:

manufacturing, distributing, and selling airbags that can cause serious bodily injury or death; intentionally concealing the foregoing from Plaintiff, and federal regulators; and making incomplete representations about the safety and reliability of its airbags, while purposefully withholding material facts from Plaintiff and federal regulators that contradicted these representations.

**Takata's Airbags Have A Common, Uniform Defect**

### Takata Recklessly Chose An Inexpensive and Dangerous Propellant

53.     The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

54.     The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



55.     When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

56.     In the late-1990s, Takata's managers pressured its engineers in Michigan  to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives. Ammonium nitrate is a dangerous material that should not be used in airbags.  It is  an inherently volatile and unstable chemical.

57.     Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

58.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks. Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or ***might even blow up*** because of the excess pressure generated" (emphasis added).

59.     Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

60.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

61.     Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant. Indeed, Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

62.     The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

63.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years.  Nevertheless, rather than switch to the compound it knew would be safer, even if  more

expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

64.     For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

65.     Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013.   These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

**Takata's Knowledge of the Inflator Defect**

66.     Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

67.     At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North

America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

68.     Mr. Shimizu grossly understated the problem. Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

69.     On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.  Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant.

70.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

71.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

72.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded

= one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

73.     Yet handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

74.     Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors.

75.     Moreover, while Defendants had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several Vehicle Manufacturer Defendants have been or will be required to recall model year 2013, 2014, 2015, and 2016 vehicles because of the risk of the Takata airbags rupturing. And Takata has now admitted that replacement airbags installed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

**Takata Airbag Failures and Defendants' Inadequate Response**

**2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)**

76.     Honda was among the first automakers to use Takata's new air bags. Honda and Takata began discussing inflators with ammonium-nitrate propellant as early as 1998, and Honda first installed such inflators in its 2001 Model Year vehicles. Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

77.     On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a  Takata airbag-related accident. As summarized in a later section of this Complaint, her car was not recalled until May 2015, more than a decade later.

78.     Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW. That investigation took place at a Takata facility in Michigan, and involved inflators sold to BMW, Honda, and Toyota. The testing was ordered by  a senior Takata executive, and the results indicated that the inflators were defective. Takata confirmed this in a defect information report to NHTSA more than a decade later.

79.     In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver. Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before  turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for  the incident. Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge. Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

80.     Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant. As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit. In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

81.     Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards. The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

82.     Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture. The result was so startling that engineers began designing possible fixes in anticipation of a recall.

83.     But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed. One former Takata employee stated that "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.' It was not standard procedure."

84.     Takata did not disclose these tests to the public or federal regulators. In  regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, Plaintiff allege, upon

information and belief, that Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

85.     In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags. As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators. Rather, it callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

86.     After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrap yards for the same purpose.

87.     Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion. Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

88.     The victims of the four Honda incidents – one in 2004 and three in 2007 –  brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a

substantial risk of serious injury or death when deployed.  In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

89.     On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.

90.     On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

91.     Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

92.     As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

93.     Even as Takata and Honda advocated a minuscule recall focused on older models— less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

94.     Additional incidents took place after the 2008 Recall that underscored its inadequacy:

95.     On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida.  The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she was bleeding from a severe gash in her neck. Ms. Griffin's car was not part of the 2008 Recall.  Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

96.     On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the collision itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death. Ms. Parham's car was not part of the 2008 Recall.

97.     Another Takata airbag-related fatal incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

98.     According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

99.     With incidents mounting, Takata and Honda revisited the issue yet again.  In  June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington. At the time, Takata engineers claimed that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the  explosives unstable. The Takata engineers further claimed that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag,

instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

100.    After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to.  At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

101.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

102.    As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall"). Thus, it was two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

103.    In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

104.    NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

105.    NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

106.    In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during  airbag inflator module assembly."

107.    Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

108.    Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

109.    Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem.

110.    Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

111.    Takata also claimed that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were  manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in  the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information.  Instead, it gave just the manufacturing dates.

112.    In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

113.    Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well  as the analysis that supported it, was presented to Honda on June 12, 2009."

114.    In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda.

The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda."  This statement would prove to be false.

115.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

116.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades  at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

117.    The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

**2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations**

118.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

119.    In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

120.    Honda's explanation for the airbag defect changed yet again, but still  misleadingly focused on the manufacturing process. Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

121.    Once again, however, injuries continued to mount:

122.    In April 2010, two months after the 2010 Recall, the Takata airbag in  Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light  in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She  survived only because she applied pressure with her fingers to stem the arterial bleeding.

123.    On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

**2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V- 260)**

124.    In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might  have had the part installed.

125.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators." On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

126.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

127.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

128.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

129.    Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act. In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents

resulting in injuries or deaths to NHTSA between 2003 and 2014. Eight of these incidents involved Takata airbags. In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

130.    Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

131.    Dangerous and tragic incidents continued to mount during this period.

132.    On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

133.    On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him.  Honda reached  a confidential settlement with the driver in 2013.

134.    On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

135.    On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

136.    On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

137.    On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a confidential settlement.

138.    On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

**2013-2014: Takata's Belated Admissions of Broader Defects and  the 2013 Recall (13V-132)**

139.    By 2013, it became clear to federal regulators, and Defendants were already aware, that the Defective Airbag issue and the number of Defective Airbags were much more significant than Takata or Honda initially reported to NHTSA.

140.    On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags.  By March 6, 2013, Honda claimed that:

141.    A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

142.    In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality. Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

143.    On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

144.    In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the

inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

145.   On April 11, 2013, Takata filed a Defect Information Report titled  "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

146.   Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time  due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

147.   It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

148.   In April 2013, based on Takata's new admissions, six major automakers,  including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

149.   With the increased awareness and scrutiny, news of incidents became more widespread:

150.   On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

151.   On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag.  Ms. Erdman filed suit and reached a confidential settlement.

152.   Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face. In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building.  As *The New York Times* reported:

153.   The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object. And problems persist with Honda's reporting of potential defects.

154.   In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

155.   On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel.  According to a lawsuit, metal from the airbag  hit Owens in the face and left her blind in one eye.

156.   By 2014, the incident rate picked up even more dramatically, with over a dozen incidents involving injuries or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles

taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California.  For example:

157.    On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

158.    On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram 1500 ruptured and ejected metal fragments following an accident. The driver suffered severe physical injury as a result.

159.    On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

160.    On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

161.    In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

162.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents included both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

163.    On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an

investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

164.    Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers  for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter  further stated:

165.    If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which  models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers.

166.    On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

167.    On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

168.    By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million. The Vehicle Manufacturer Defendants, including the Honda Defendants, however, had still not recalled all of the vehicles containing Defective Airbags.

169.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as  many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger

compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

170.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

171.    The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

172.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

173.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

174.    On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCracken County, Kentucky.

175.    On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

176.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

177.    On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

178.    On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

**2014-2015: Forced National Recall And Takata's Admission of a Defect**

179.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now  "7.8 million Affected Vehicles":

180.    The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

181.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

182.    The U.S. Department of Justice also began investigating whether Takata committed any crimes. On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

183.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

184.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall. Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

185.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get  to the bottom of the root cause on this. We have been pushing them to do so."

186.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags. Days later, Mazda expanded the geographic scope of its recall. By December 23, BMW had also agreed to a nationwide recall.

187.    Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved." A few months later, in March 2015,  Honda  announced an advertising campaign to promote the recall—a step it could and should have taken a decade ago. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

188.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

189.    In response to public scrutiny and pressure from NHTSA and private plaintiffs, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

190.    In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes

to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

191.    Still, even Takata's defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's airbags containing ammonium nitrate. And shockingly, certain Vehicle Manufacturer Defendants continue to equip new vehicles with airbags containing ammonium nitrate, even after admitting that airbags containing ammonium nitrate as the primary propellant are prone to rupture, and thus create an unacceptable public safety hazard.

192.    Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

193.    As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million. While Takata has records tracking which manufacturers it sold Defective Airbags to, it claims not to have records indicating which vehicles those Defective Airbags were installed in. The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs, and its corresponding admission that its airbags are defective.

194.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed in section V, *infra*.

195.    On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in  San Antonio, Texas.

196.    On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

197.    On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

198.    On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

199.    On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old Kylan Langlinais's carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries that same day.

200.    Over the past 15 years that Takata has known there was a problem with the safety of its airbags, there have been at least 11 deaths and 180 injuries linked to defective Takata airbags nationwide. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota. Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

201.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Vehicles, an event that may be tied to the unstable and volatile  ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed

still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).  For example:

202.    Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

203.    Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

**The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and "Reliable"**

204.    At all relevant times, in advertisements and promotional materials, the Vehicle Manufacturer Defendants continuously maintained that their vehicles were safe and reliable. Plaintiff, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Vehicles. The misleading statements about Vehicles' safety in Defendants' advertisements and promotional materials were material to decisions to purchase or lease Vehicles.

205.    Examples of the Vehicle Manufacturers' safety and reliability representations, from 2000 through the present, include the following:

**Toyota:**

206.    In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."

207.   In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

## Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers

208.   This case flows directly from the admitted fact that Takata's airbag systems were defectively manufactured since at least 2001, and perhaps earlier.  On Tuesday, November 18, 2014, the U.S. Department of Transportation's National Highway Traffic Safety Administration (NHTSA) announced the following:

> "[A]nnounced it is calling for a national recall of vehicles with certain driver's side frontal air bags made by Takata.   'By demanding this national recall, NHTSA has demonstrated once again that it will follow data and evidence to protect the lives of Americans on the road and to hold manufacturers accountable,' said Secretary Anthony Foxx.
>
> NHTSA contacted Takata and the vehicle manufacturers this week to call for the national recall of these vehicles after evaluating a recent incident that involved a failure in a driver's side air bag inflator outside an area of high absolute humidity….  As part of these efforts, and its ongoing investigation into both the defect and the scope of the recalls, the agency also issued a General Order to Takata and all ten of the vehicle manufacturers that use Takata air bag inflators – BMW, Chrysler, Ford, General Motors, GM, Mazda, Mitsubishi, Nissan, Subaru and Toyota – requiring each manufacturer to file, under oath, a detailed report and produce all related documents after completed, ongoing or planned testing of Takata inflators outside the current regional recall areas."[1]

209.   Toyota, as the manufacturer of the vehicles, and Takata, as the manufacturer and seller of the subject defective airbags, have a duty under law to take all necessary steps to ensure that their products function as warranted, as the difference between life and possible death or severe injuries lies in the adherence to these legal duties.  Defendants' airbags must function in an accident as represented, and for the intended purpose.  Defendants, and each of them, placed profits before safety in the manufacturing of their passenger restraint system.

---

[1] http://www.nhtsa.gov/Aoubt+NHTSA/Press+Releases/DOT-calls-for-national-recall-of-takata-driver-air-bags

**Slow and Inadequate Recalls**

210.    Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million vehicles will be recalled in the United States due to the Inflator Defect.

211.    At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and expected to increase production to 1 million replacement inflators per month by September 2015—well short of the number required to supply the ten automakers that have issued recalls.

212.    At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

213.    Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

214.    Honda stated that it would not send recall letters to car owners or lessees until there are parts available, meaning that many drivers would not receive notices for weeks or longer, as they continue to drive vehicles with potentially deadly airbags. Honda owners who have received recall notices have been told to wait at least a month before their authorized dealer has availability to assess their vehicle.

215.    In response to the airbag replacement shortage, certain Vehicle Manufacturer Defendants have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the alternative, some Vehicle Manufacturer Defendants are advising customers to refrain from driving their vehicles until the airbags can be replaced.

216.    Other automakers have also chosen to "repair" their customers' vehicles, not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

217.    Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . .

218.    Motor Vehicle Safety Act (49 U.S.C.), §30122(b), prohibits a manufacturer from knowingly making a safety device inoperable unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."

219.    As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but also a more frightening concern: "no one knows if the replacement inflators currently being installed will suffer the same issue." Indeed, in response to repeated questioning at a Congressional hearing in June 2015, Takata's representative refused to assure the public that replacement inflators containing ammonium nitrate would be safe and not prone to rupture.

**Failure to Provide Replacement Vehicles**

220.    The Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiff is left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until Vehicle Manufacturer Defendants complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

221.    As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

222.    Vehicle Manufacturer Defendants are not providing loaner or replacement  vehicles on a comprehensive basis.

**Defective Replacement Airbags**

223.    Perhaps most alarming, the replacement components manufactured by Takata that the Vehicle Manufacturer Defendants are using to "repair" recalled Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

224.    Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed in Vehicles by Vehicle Manufacturer Defendants through the recall  process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations. As a result, Takata cannot reasonably assure Plaintiff that Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

### **Fraudulent Concealment**

225.    Upon information and belief, Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Prior to installing the Defective Airbags in their vehicles, the Vehicle Manufacturer Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, Honda was again made aware of the Inflator Defect in the Takata airbags in Honda's vehicles in 2004, following a rupture incident. And the Vehicle Manufacturer Defendants were again made aware of the Inflator Defect in Takata's airbags no later than 2008.  All of these Defendants have concealed from or failed to notify Plaintiff and the public of the full and complete nature of the Inflator Defect.

226.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

227.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### **Estoppel**

228.    Defendants were and are under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiff reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on

the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### Discovery Rule

229.   The causes of action alleged herein did not accrue until Plaintiff  discovered that her vehicle had the Defective Airbags.

230.   Plaintiff, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiff had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

### Statement of Facts on each Specific Accident

231.   On or about March 4, 2016, Ana Caramanian was the driver of a 2003 Toyota Corolla (VIN 1NXBR32E53Z075102) when suddenly and unexpectedly, a vehicle swerved across the lanes of traffic causing client's vehicle to collide head-on with the passenger side of their vehicle.  The airbags aggressively exploded.  Said accident and the airbag failure resulted in the death of Ana Caramanian and Brian Caramanian's loss of his mother.  According to the NHTSA website, this vehicle had a Takata Inflator Recall (15V286) on the passenger airbag inflator and a Takata Airbag recall (15V043) on all front and side airbags.  Ana was sitting in the driver's seat when the accident occurred.

### Claims for Relief

#### Negligence, Gross Negligence and Recklessness

232.   Defendants were negligent in designing, manufacturing, and providing warnings for the Plaintiff's vehicle and the safety equipment installed thereon, as set forth in the paragraphs above. Defendants acted unreasonably in manufacturing and selling vehicles with design,

manufacturing, and informational defects and concealing such defects from Plaintiff, the public, and NHTSA.

233.    Defendants failure to notify NHTSA and the vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence per se. These statutes and regulations were enacted for the protection and safety of the public.

234.    Defendants had a duty to ensure that its vehicles and the safety equipment installed thereon were reasonably safe to operate and did not contain defective components, and to produce vehicles with appropriate warning instructions. When Defendants learned that the Plaintiff's vehicle was defective, they had a continuing duty to warn Plaintiff of the existence of the defect, including after the original sale of the vehicle.

235.    Defendants were also negligent in providing warnings about Plaintiff's vehicle and the safety equipment installed thereon, and unreasonably concealing the design, manufacturing, and informational defects that Defendants knew existed in their vehicles and the safety equipment installed thereon. Defendants had a continuing duty to monitor their vehicles for safety-related defects and warn Plaintiff, the public, and NHTSA about safety-related defects in the vehicles. This duty is based on the direct and continuing relationship between Defendants and the owners of the vehicles. Among other things, Defendants had a statutory duty to warn owners of the vehicles, including Plaintiff, of safety defects and did, in fact, warn owners of Defendants' vehicles, including Plaintiff, of the safety defects (though the warning arrived years later than it should have) and unreasonably minimized the risk of harm.

236.    In addition, Defendants failure to notify NHTSA and Subject Vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577

constituted negligence per se. These statutes and regulations were enacted for the protection and safety of the public.

237.    Thus, independent of any failures by Defendants as described herein, Defendants breached their duties to Plaintiff by failing to provide appropriate notice of and repair procedures for the defect in Plaintiff's vehicles. In doing so, Defendants departed from the reasonable standard of care required of it.

238.    Defendants' negligence proximately caused the injuries, death and damages sustained by Plaintiff, as set forth herein. Defendants' negligence in manufacturing and selling a vehicle containing design and manufacturing defects, including the safety equipment installed thereon, and Defendants' negligence in failing to adequately warn Plaintiff about known defects in their vehicles and in violating the statutes and regulations that required Defendants to recall Plaintiff's vehicles for safety-related defects proximately caused Plaintiff's inability to avoid the damages resulting from the crash made the basis of this lawsuit that left them severely injured.

239.    Defendants are liable for compensatory damages based on their conduct and for compensatory and punitive damages based on Defendants' own independent conduct.  Defendant is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

**Strict Liability**

240.    Plaintiff was harmed by Defendants' defective airbags, products distributed manufactured and sold by Defendants.  Defendants' airbags contained a manufacturing and design defect.  Defendants negligently failed to provide any warning, or any sufficient warning of potential safety hazards from their products.

241.     As a further result direct and proximate result of Defendants' negligence, manufacturing and design defects, Plaintiff incurred losses and damages for personal injury, death, and property damage, loss of use and enjoyment of life and their property, the need for periodic medical examination and treatment, and economic losses, including wage loss, and the expenditure of time and money, and will continue to incur damages in the future.

242.     The Defendants conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, and a callous disregard for human life, safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiff and was motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and/or cost avoidance, to the virtual exclusion of all other considerations.  Defendants' defective airbags were substantial factors in causing Plaintiff's death, damages and losses.  Defendants engaged in conduct amounting to malice, fraud and oppression entitling Plaintiff to punitive damages.

243.     Due to Defendants' negligence, manufacturing and design defects, each of the Plaintiff is entitled to compensatory damages in a sum to be determined by the jury, plus punitive damages in a sum equal to a multiplier of damages determined to be adequate by the jury.

**<u>Fraudulent Concealment</u>**

244.     As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles from Plaintiff, the public in general, the NHTSA and continues to do so today.  Defendants knew that the Vehicles, including the Plaintiff's vehicle, were designed and manufactured with defective airbags.  For example, Defendants knew, inter alia, that: the Vehicles contained defective airbags–increasing the risk serious injury or death in a crash; Yet Defendants intentionally, deliberately, and actively concealed this material information from consumers in the United States by, for example, secretly settling defect-related litigation to

avoid disclosure of the defect and secretly considering multiple solutions to the defect only to reject them due to cost concerns. Defendant vehicle owners like Plaintiff had no knowledge of these safety-related defects.

245.    Defendants had a duty to disclose the material facts to Plaintiff, the public who owned the vehicles, and NHTSA, but failed to do so. Defendants had a duty to disclose the facts to Plaintiff because: (1) Defendants knew that Plaintiff was ignorant of the material facts that Defendants intentionally concealed; (2) Plaintiff did not have an equal opportunity to discover the material facts that Defendants intentionally concealed; and (3) Defendants had notification and recall obligations under the Safety Act with respect to the vehicles, including a continuing duty to monitor and notify owners of the vehicles' defects.

246.    Defendants knew that Plaintiff had no knowledge of the concealed facts, and that Plaintiff did not have an equal opportunity to discover the concealed facts. Defendants were in a position of superiority over Plaintiff. Indeed, Plaintiff trusted Defendants not to allow defective vehicles for which it was responsible to remain in the marketplace. Plaintiff further trusted Defendants to warn of defects and to recall defective vehicles.

247.    By deliberately concealing these material facts, Defendants intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Plaintiff, and the public in general. Defendants further intended to induce NHTSA not to recall Plaintiff's vehicles, as well as other Vehicles, in order to reduce its eventual financial exposure.

248.    Plaintiff reasonably and justifiably relied on Defendants' nondisclosure, and reasonably but unknowingly continued to use their vehicles until the date of the accident.  Plaintiff

relied on Defendants' omission and was deceived by Defendants' omission into believing that her vehicle was safe.

249.    Plaintiff would not have purchased her vehicle had she known of the defective airbags.  Defendants' reaped the benefit of the sales and leases from the Vehicles because it did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Vehicles' defects, Defendants prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because Defendants had not placed this matter before NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

250.    As a direct and proximate result of Defendants' wrongful conduct and fraudulent concealment, Plaintiff suffered damages described herein.

251.    Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff, such that punitive damages are appropriate.

**Fraud by Non-Disclosure**

252.    As set forth above, Defendants became aware of issues relating to the defective airbag as early as 2003.

253.    As set forth above, Defendants intentionally concealed or failed to disclose material facts from the Plaintiff, the public and NHTSA.

254.    As set forth above, Defendants possessed independent knowledge of the defects in the Plaintiff's vehicles and the need to undertake multiple design steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiff.  This knowledge was based,

in part, on the information from records, files, reports and other documents and materials regarding the defective airbag inflator.

255.    Defendants had a duty to disclose the facts to the Plaintiff, the public and NHTSA. Defendants knew (1) that the Plaintiff was ignorant of the material facts that Defendants did not disclose and/or intentionally concealed; and (2) the Plaintiff did not have an equal opportunity to discover the material facts that Defendants did not disclose and/or intentionally concealed. Defendants' fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incident of the Plaintiff.

256.    The Plaintiff relied on Defendants' non-disclosure and she died as a result of acting without knowledge of the undisclosed facts.

**Damages – Wrongful Death Claims**

257.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been (and continues to be) damaged in the form of the wrongful death of their mother and seeks to recover the following damages: (a) past and future mental anguish as a result of the death of their mother; (b) past and future loss of companionship and society as a result of the death of their mother; (c) past and future pecuniary loss as a result of the death of their mother; (d) loss of inheritance as a result of the death of their mother.  All of the damages sustained by Plaintiff was reasonably foreseeable by Defendants, and exceed the minimum jurisdictional limits of this Court. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**Damages – Survival Claims**

258.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been (and continues to be) damaged in the form of: (a) physical pain and mental anguish sustained by the Decedents as a result of the incident in question and prior to their death; (b) medical

expenses for the reasonable and necessary services provided for the Decedents as a result of the incident in question; and (c) reasonable and necessary funeral and burial expenses for the funeral and burial of the Decedents. All of the damages sustained by Plaintiff was reasonably foreseeable by Defendants, and exceed the minimum jurisdictional limits of this Court. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

**Exemplary/Punitive Damages**

259.    Plaintiff is also entitled to exemplary and punitive damages.

260.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective vehicles makes it clear that Defendants are guilty of exceptional misconduct. Defendants were issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration. Defendants have been aware for years that the airbags in the Subject Vehicles were defective and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles with safety systems that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. Defendants knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. These Defendants acted maliciously, wantonly, and/or recklessly, and clearly Defendants are guilty of exceptional misconduct and gross negligence. Plaintiff demands punitive damages for this conduct.

261.    Plaintiff would further show that the clear and convincing evidence in this case will show that Defendants consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicles and failing to recall the vehicle in a timely manner. Defendants had actual, subjective awareness of the risk involved but nevertheless

proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff. Therefore, punitive damages are sought and should be assessed against Defendants.

**Pre-Judgment Interest and Post-Judgment Interest**

262.    Plaintiff is entitled to pre-judgment and post-judgment interest (to be determined).

**Jury Demand**

263.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable.

**Prayer**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.    an award to Plaintiff for actual damages, compensatory and exemplary damages, including interest, in an amount to be proven at trial;

B.    an award of costs, as allowed by law;

C.    an award of pre-judgment and post-judgment interest, as provided by law;

D.    leave to amend this Complaint to conform to the evidence produced at trial; and

E.    such other relief as may be appropriate under the circumstances.

Dated: June 6, 2018

RESPECTFULLY SUBMITTED,

*/s/ Mitchell A. Toups*
Mitchell A. Toups (TX Bar # 20151600)
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577
Email:  matoups@wgttlaw.com

James R. Dugan, II
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Gregory K. Evans (TX Bar  No. 24002065)
Law Offices of Gregory K. Evans, PLLC
3900 Essex, Suite 690
Houston, TX  77027
(713) 840-1299
Facsimile:  (281) 254-7886
Email:  greg@gevanslaw.com

Craig W. Carlson
Texas Bar No. 00792039
The Carlson Law Firm, P.C.
100 E. Centex Expressway
Killeen, TX 76542
(254) 526-5688
Facsimile:  (254) 526-8204
Email:  ccarlson@carlsonattorneys.com

**Attorneys for Plaintiffs**